# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF TENNESSEE IN KNOXVILLE

| | | |
|---|---|---|
| SILVIA SAPP and RODRIGO PAREDES, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No.: _____ |
| | ) | |
| SUMMER BAY SALES & MARKETING, L.C., JUDY SCARBROUGH, and ALICE BALL, | ) ) ) ) | JURY REQUESTED |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Come the Plaintiffs, Silvia Sapp ("Sapp") and Rodrigo Paredes ("Paredes"), by and through counsel, and set forth the following allegations and prayers for relief:

1. Sapp is a resident of Gatlinburg, Tennessee, but originally immigrated to the United States from Peru.

2. Paredes, Sapp's brother, is also a resident of Gatlinburg, Tennessee, but also immigrated to the United States from Peru.

3. Sapp and Paredes are both Hispanic as native Peruvians.

4. Summer Bay Sales & Marketing, L.C. ("Summer Bay"), is a Florida limited liability company with its principal address at 25 Town Center Boulevard, Suite C, Clermont, Florida 34714. Summer Bay employed Sapp and Paredes in Tennessee, and can be served with process via its registered agent: Alexander Johnson, 150 Court Avenue, Sevierville, Tennessee 37862.

5. Judy Scarbrough ("Scarbrough") is a resident of Blount County, Tennessee, and, at all times relevant herein, worked in a management capacity for Summer Bay at Gatlinburg

Town Square by Exploria Resorts ("GTS") in Sevier County, Tennessee. By information and belief, she resides at 425 Domar Drive, Townsend, Tennessee 37882.

6. Alice Ball ("Ball")[1] is a resident of Sevier County, Tennessee, and, at all times relevant herein, worked for Summer Bay at GTS in Sevier County, Tennessee. By information and belief, she resides at 1369 Shirley Myers Lane, Sevierville, Tennessee 37862.

7. Jurisdiction is proper in this Honorable Court pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367 based on Defendants' violations of the Fair Labor Standards Act (29 U.S.C. § 201, *et seq.*). Venue is proper in this Honorable Court as Summer Bay employed both Sapp and Paredes at GTS in Sevier County, Tennessee. Further, Scarbrough and Ball, while in the course and scope of their employment with GTS, defrauded and mistreated Sapp and Paredes in Sevier County, Tennessee.

8. Sapp was born in Lima, Peru, in 1977, later immigrating to the United States to live in New York and Tennessee.

9. In 2016, Sapp started working for Summer Bay at GTS as a Marketing Representative.

10. Summer Bay did and continues to classify marketing representatives as non-exempt under the Fair Labor Standards Act ("FLSA"). This means, at all times while working for Summer Bay, Sapp remained overtime eligible.

11. As a Marketing Representative, Sapp was tasked with job duties including, but not limited to, meeting guests, generating qualified tours, and contacting guests to schedule property tours.

---

[1] Upon information and belief, Ball may also go by the names Alice Morgan or "Alli."

12. As a Marketing Representative, Sapp reported to the Marketing Manager. At times when there was no Marketing Manager though, Sapp and other marketing representatives reported directly to Scarbrough.

13. While with Summer Bay, Sapp consistently performed well in communicating with guests and scheduling tours.

14. As a Marketing Representative, Sapp's base hourly pay was set at $7.25. Depending on her number of "qualified" tours per pay period, however, Sapp's commission rates increased upon hitting certain levels.

15. During one pay period in October 2016, for example, Sapp and other marketing representatives were given a "minimum level" of qualified tours at 14, with commission rates increasing at 18, 21, 22, 24 and 27 tours.

16. As Sapp and other marketing representatives understood it, "qualified" tours meant those guests actually attended. If a scheduled guest would "no show" for a tour, for instance, Sapp would not receive credit or additional compensation for said tour.

17. Ball tracked tour activities, including the tabulation of marketing representative compensation/commission based upon qualified tours, no show tours, cancelled tours, etc.

18. When a guest would attend a scheduled tour, Summer Bay sales employees would then attempt to sell said guest timeshare products/properties.

19. As Sapp and other marketing representatives understood it, the Summer Bay sales employees were expected to sell (close) a certain percentage of products/properties based upon the number of qualified tours.

20. Therefore, those Summer Bay sales employees and management, such as Scarbrough and Ball, were under intense pressure to keep up good sales percentages in relation to the number of "qualified" tours.

21. When those sales percentages would fall below expectations, Ball, under the direction of Scarbrough, would retroactively record "qualified" tours as cancelled tours. Ball, Scarbrough and Summer Bay then paid Sapp, and likely other marketing representatives, lower commission rates based on "qualified" tours which were fraudulently tabulated and misrepresented as cancelled within company communications. In many situations, Sapp spoke with guests who confirmed attending tours that Ball had marked as cancelled. (Or that Ball would simply cancel or try to move without any thought for the guests or Sapp.) When Sapp tried to confront Ball and Scarbrough, however, Sapp was told she should just appreciate having a job and that her pay by Ball should remind her of that (inferring that Sapp made enough money already).

22. Even with Defendants' fraud and misrepresentation, Sapp continued to thrive and earn a considerable living based on her skill as a marketer.

23. During one pay period from October 29 to November 11, 2016, for example, Sapp earned gross pay from Summer Bay of $3,702.36.

24. Sapp performed well at first even despite facing pervasive gender, racial and national origin discrimination.

25. While working under former Marketing Manager, Lisa Avery ("Avery"), Sapp was routinely forced to tolerate Avery talking with marketing representatives Jim Keys ("Keys") and "Tilly" Byrum ("Byrum") about how immigrants needed to go back to "where they came

from" and stop taking jobs from Americans. Sapp's co-workers would often also complain in her presence about how people who "don't speak good English" were allowed to work at GTS.

26. Sapp also believes Avery and other co-workers referred to Sapp by the derogatory nickname "Chihuahua," as Sapp is a petite, Hispanic female.

27. Keys, in particular, would often voice his displeasure working with "immigrants" like Sapp and Paredes, to which Sapp would complain to Avery and/or Scarbrough. In response, Scarbrough would often say something to the effect of, "He is just a grumpy old man upset with life," and instruct Sapp to "just ignore" such inappropriate talk.

28. After Sapp continued to complain of her mistreatment and the hostile work environment, Avery eventually retaliated by terminating Sapp in August 2016. Sapp immediately attempted to address that adverse action with Darlene Suter ("Suter") in Human Resources ("HR") and with Scarbrough.

29. Scarbrough instructed Sapp to try and reach out to Avery to talk. Sapp did attempt to reach out to Avery, to which Avery responded by text message on August 20, 2016: "Hi Sylvia, there is no need for us to meet. I will not consider hiring you back. I'm sorry that it didn't work out."

30. Based on Sapp's complaints, however, she came to learn that Suter began investigating the underlying situation. Sapp believes Suter likely found evidence of the aforementioned discrimination, harassment and retaliation in the marketing department.

31. In the early fall of 2016, Sapp was brought back into marketing at Summer Bay. Keys walked out and quit the same day Sapp returned.

32. Even upon returning though, Sapp still found herself in a hostile and discriminatory environment.

33. At times, for example, Sapp would overhear Avery and/or Holly Hodge ("Hodge") mocking Sapp with a co-worker, Sara Morgan ("Morgan"). They would mock Sapp's accent and refer to her as "Chihuahua" while Morgan laughed. This was sometimes even in the presence of or around Shonda Worthington ("Worthington"), the Marketing Manager, who did nothing to step in or remedy.

34. Such mistreatment and other issues eventually caused Sapp to file a formal complaint with HR in October 2016, therein alleging "unlawful harassment on the bases [sic] of race/color" that was creating "an intimidating and hostile environment."

35. In October 2016, Avery was either fired or quit, yet Sapp was still subjected to routine mistreatment.

36. As another example, Paredes showed Sapp a series of text messages from Byrum, who was not working for Summer Bay at the time. Therein, Byrum made a number of serious threats and lobbed outrageous insults at both Sapp and Paredes, including, but not limited to, "bitch," "whore," "come outside and deal with me," "faggot," "scum," "come find me b4 I find you," "I'm gonna make u a man since ur mom and dad made 2 pussys"

37. Despite making management aware of Byrum's outrageous conduct, Summer Bay soon re-hired Byrum and assigned him to again work in marketing with Sapp and Paredes. This left both Sapp and Paredes in a state of shock, having to work with a man who threatened them, insulted them and criticized their family. Sapp, in fact, has even sought mental health treatment to help cope with her time at GTS.

38. It was Sapp and Paredes' impression that Byrum's text messages showed an unstable and dangerous individual. Byrum even once told Sapp he knew how to get away with a crime, and he knew how to hide as to never be found.

39. Sapp was also feeling the disparate impact of discrimination and retaliation from a monetary perspective. During a pay period from January 21 to February 3, 2017, for instance, Sapp only received $966.01 in gross pay from Summer Bay. This is partially because Summer Bay management provided preferential treatment and scheduling to its non-Hispanic marketing employees.

40. Marketing representatives made more money by booking more guest tours. Yet guests routinely checked-in at GTS in the late afternoon, thus morning shifts were known to be less lucrative than afternoon/night shifts in marketing.

41. Instead of dividing those shifts evenly, and despite her repeated complaints, Sapp was routinely given morning shifts while Byrum and another non-Hispanic employee, Hodge, for example, were given later shifts.

42. Byrum, in fact, was often allowed to work Thursdays in marketing alone, despite Thursdays being one of the busiest days for new guests to arrive at GTS. Byrum was allowed to come in to work on days when he was scheduled "off," even though such preferential treatment was detrimental to Sapp and other female employees.

43. Hodge and Byrum also often conspired with Morgan, who worked the front desk, to have guests avoid Sapp altogether. Instead of sending guests to marketing, which was standard practice, Morgan would just send guests to their rooms. She would then let Hodge or Byrum know. Morgan did this knowing Hodge or Byrum could contact guests directly or leave cards in those guests' rooms stating: "Welcome to the Smokies! Call to have your free gift bag delivered to your room. <u>Ask for Holly or Tilly</u>." (emphasis added). Hodge would routinely write her name only, or her name and Byrum's names, on such marketing materials to exclude and harm Sapp.

44. Sapp regularly complained about these issues of harassment and discrimination verbally, but, in early March 2017, she simply had enough. Sapp again brought these issues to Suter, including, but not limited to, discrimination, harassment, and retaliation at the hands of co-workers and her Marketing Manager, Worthington.

45. Worthington, for example, knowingly provided disparate treatment to Sapp and favored non-Hispanic marketing employees, Hodge and Byrum. Sapp felt this disparate treatment, both emotionally and economically, through unfair scheduling and marketing rotations. Byrum was also managed, as the only white male, under a different set of rules, including Summer Bay disregarding his prior threats and harassment. Byrum was allowed at times to use the computer system to go around Sapp, marking qualified guests as "NQ" (not qualified) so it would look to Sapp like guests were off limits or not to be contacted. This allowed Byrum to essentially save certain guests for himself with Worthington's knowledge.

46. Upon bringing another formal complaint to Summer Bay's attention, Sapp soon found herself terminated.

47. On Friday, March 10, 2017, Sapp became upset after witnessing Hodge once again skip her in the marketing rotation. After Worthington failed to remedy the situation, again siding with Hodge, Sapp asked Suter for permission to clock-out. Suter indicated this should not be an issue, but Sapp was soon confronted by Worthington, her direct supervisor, and *ordered* to clock-out. Hearing this confrontation, Byrum and Hodge actually began to celebrate in front of Sapp. That same day, in fact, Hodge celebrated the termination of "Chihuahua" with Morgan and Avery on Facebook.[2]

48. Sapp actually attempted to report for her scheduled shift on the morning of March 11, 2017. Within a short time of being there, however, Worthington showed up with Ball.

---

[2] Upon information and belief, Hodge has since deleted the post at issue, likely at the direction of Summer Bay.

Worthington said to Sapp, "You are fired and I 100% have Judy's approval." Sapp was told to clock-out and leave the property. On that same morning, Worthington texted Sapp, "I told you last night that you were fired."

49. After being fired, Suter informed Sapp that she investigated the matter and reported it to the corporate office in Florida. Yet Sapp was left unemployed and unpaid from March 10-11, 2017, forward.

50. In fact, it was not until after Sapp's counsel sent a representation letter to Florida in late April that Sapp, through undersigned counsel, was told she was allegedly never terminated. Summer Bay, in a letter from its counsel dated April 25, indicated Sapp was "suspended pending investigation." So, after one and one half months, the matter was still allegedly being investigated while Sapp received no wages/income.

51. In addition to the allegations already set forth, Paredes also felt the effects of discrimination and harassment while with Summer Bay.

52. Throughout his time with the company, Paredes would be introduced to guests or others as "Taco" or "Pedro from Panama" or "Juan from Mexico" or any number of other ethnic stereotypes. This occurred despite his repeated requests to be referred to as Rodrigo (although he also answers to Rod). Such inappropriate names and stereotypes would be uttered in front of or even by management, including Scarbrough.

53. Paredes, like Sapp, brought these issues to the attention of Suter and Scarbrough. This included, but was not limited to, name calling, harassing statements and preferential scheduling in favor of non-Hispanic employees.

54. Despite complaints to management and HR, Paredes continued to experience a hostile work environment related to his race and national origin.

55. Co-workers, for example, would often discuss "immigrants" in front of or to Paredes, including statements like, "If it ain't white, it ain't right", "They're coming, hide your wallet", or "dirty" immigrants coming to take "our jobs." The same co-workers also rarely hesitated to use the word "nigger" when around Paredes or others.

56. During his work with Summer Bay, Paredes spent time in both the sales and marketing departments. In marketing, like Sapp, Paredes suffered disparate treatment as non-Hispanic employees received preferential rotations and scheduling.

57. But Paredes also felt such disparate treatment when in sales. As he understood it, sales employees were to receive a 14% commission related to timeshare sales. Paredes, however, was made to split or share his commissions with non-Hispanic members of the sales team. This even occurred when *only* Paredes, as a Spanish speaker, could communicate with Spanish-speaking customers.

58. In fact, Paredes was often told to assist other sales team members with Spanish-speaking customers, and he did so willingly. When it came time for commissions though, Paredes would receive none if the Spanish-speaking customer originated with another sales team member. Put simply, "sharing" commissions was only applied to Paredes detriment, not his benefit.

59. This all came to a head in early 2017. During a morning sales meeting attended by Scarbrough and others, it was mentioned that the sales team should expect more tours when Sapp returned from a European vacation. Then several sales team members started making inappropriate jokes about Sapp's return, including questions about whether she would have to jump over or dig under "Trump's wall," and one co-worker gesturing as if Sapp would probably have to return to the United States in handcuffs.

60. Angered at the racially offensive remarks about his sister, Paredes left the sales meeting. But two co-workers, Dave and Craig, soon followed Paredes to his work area, questioning him on his religion, his politics and his stance on immigration. Despite repeated attempts by Paredes to end the conversation, they persisted. At one point, Craig even asked Paredes if he "was legal."

61. Paredes attempted to finally end the conversation by going outside, but was again followed by co-workers shouting at him about "deportation policy" and other immigration matters.

62. Paredes soon took these matters to Scarbrough, who said she did not believe it and that Paredes was "acting his age." Paredes asked Scarbrough if these things would happen if he "was white with blue eyes." Yet Scarbrough never indicated an intent to remedy the situation, instead telling Paredes to just "cool off and calm down." After Paredes left that day, he only returned to try and retrieve his license (and Scarbrough even made that process difficult).

63. When faced with repeated and pervasive discrimination and harassment, Paredes was left with no choice but to leave the company. After this constructive discharge by Summer Bay, however, Paredes quickly found new employment with Wyndham, though he has still not reached prior levels of income with his new employer.

### COUNT I – VIOLATIONS OF
### THE TENNESSEE HUMAN RIGHTS ACT (Tenn. Code Ann. § 4-21-101 *et seq.*)

64. Plaintiffs reference and rely on the allegations set forth in Paragraphs 1-63 of this Complaint.

65. Plaintiffs were entitled to a workplace free of discrimination/retaliation.

66. Plaintiffs repeatedly were subjected to discrimination and harassment in the workplace by the Defendants.

67. Plaintiffs repeatedly made complaints of discrimination and harassment, both verbally and in writing, to Summer Bay management and HR.

68. Yet Summer Bay either ignored these complaints and/or failed to properly address them in a way to end discrimination, harassment, disparate impact and Plaintiffs' hostile work environment.

69. Plaintiffs also suffered several adverse employment actions due to discrimination/ retaliation, including unfavorable terms, conditions, and privileges of employment, reduced pay, wrongful termination (Sapp) and constructive discharge (Paredes).

70. Summer Bay violated the Tennessee Human Rights Act by discriminating against Plaintiffs and subjecting them to a hostile work environment and disparate treatment based on race and national origin (and, in Sapp's case, gender), and retaliating against them after making both verbal and written complaints.

71. Specifically, Summer Bay discriminated against the Plaintiffs with respect to compensation, terms, conditions, and privileges of employment because of race and national origin (and, in Sapp's case, gender) in violation of Tenn. Code Ann. § 4-21-401(a)(2).

72. Summer Bay also limited, segregated, or classified Plaintiffs in a way that deprived them of employment opportunities because of race and national origin (and, in Sapp's case, gender) in violation of Tenn. Code Ann. § 4-21-401(a)(2).

73. As a direct and proximate result of Summer Bay's violations, Plaintiffs suffered and continue to suuffer both economic and non-economic damages.

74. Accordingly, Plaintiffs are entitled to recover their damages, together with the costs of this lawsuit, including attorneys' fees, from Summer Bay.

## COUNT II – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

75. Plaintiffs reference and rely on the allegations set forth in Paragraphs 1-70 of this Complaint.

76. Summer Bay and Scarbrough's reckless action in re-hiring Byrum after he both insulted and threatened physical harm is so outrageous as not to be tolerated by a civilized society.

77. As a direct and proximate result of that action, Plaintiffs suffered and will continue to suffer serious mental injury.

## COUNT III – FRAUD AND MISREPRESENTATION

78. Plaintiffs reference and rely on the allegations set forth in Paragraphs 1-73 of this Complaint.

79. Defendants, both verbally and in writing, promised to pay Plaintiffs commission rates while working in marketing for any "qualified" tours.

80. To protect sales percentages and their image with the corporate office, however, Scarbrough and Ball misrepresented "qualified" tours as cancelled tours, effectively costing Plaintiffs, and likely others in marketing, thousands of dollars in lost commissions.

81. Defendants fraudulently communicated and relied on that misrepresented tour information, saving Summer Bay a considerable amount of money and allowing Scarbrough and Ball to improperly inflate sales department percentages.

82. Plaintiffs' reasonablyrelied on Defendants' misrepresented tour information, and accepted commission rates and pay well below what they earned based on the system communicated by Summer Bay.

83. As a direct and proximate result of Defendants' fraud and misrepresentation, Plaintiffs suffered severe economic harm.

## COUNT IV – VIOLATIONS OF
## THE FAIR LABOR STANDARDS ACT (29 U.S.C. § 201, *et seq.*)

84. Plaintiffs reference and rely on the allegations set forth in Paragraphs 1-79 of this Complaint.

85. Plaintiffs, like others in marketing, were often asked and pressured to work beyond 40 hours a week for Summer Bay.

86. Yet Plaintiffs were also told, by Scarbrough and others in management, that overtime hours/pay could neither be offered nor approved.

87. As such, Plaintiffs often logged more than 40 hours a week, only to see those hours "magically" decrease once wage and hour information was released by Summer Bay.

88. As a direct and proximate result of Summer Bay's violations, Plaintiffs suffered severe economic harm.

89. Summer Bay's failure to acknowledge Plaintiffs' time worked in excess of 40 hours per week, and failure to compensate Plaintiffs at the legally-required rate of one and one-half (1.5) times regular pay constitutes a violation of 29 U.S.C. §207.

90. As a result of Summer Bay's violation of 29 U.S.C. § 207, Plaintiffs are entitled to recover from Summer Bay their unpaid overtime compensation, an additional equal amount as liquidated damages, attorney's fees, and costs.

## PRAYERS FOR RELIEF

1. Plaintiffs reference and rely on the allegations set forth in Paragraphs 1-84 of this Complaint.

2. As a direct and proximate result of each and every one of the foregoing acts and/or violations, Plaintiffs suffered damages in an amount according to proof, including, but not limited to, loss of employment, lost wages, lost benefits, lost interest on wages and benefits,

liquidated damages, actual monetary losses suffered by Plaintiffs, inconvenience, embarrassment, humiliation, emotional distress, mental anguish, loss of lifetime earning capacity, and other incidental or consequential damages. Further, Plaintiffs seek front pay of not less than five years' worth of wages and benefits (above $750,000.00).

3. Defendants' discrimination, harassment, retaliation, fraud, misrepresentation, and intentional infliction were intentional, malicious and/or reckless with a conscious disregard for Plaintiffs' rights. Therefore, Plaintiffs also seek an award of punitive damages in an amount above $1,500,000.00.

4. Plaintiffs are further entitled to seek the recovery of attorney's fees and litigation costs pursuant to their statutory claims.

5. Plaintiffs are further entitled to pre and post judgment interest, as well as court and discretionary costs.

6. Plaintiffs request a jury to decide all issues set forth herein.

Respectfully submitted this the 16th day of June, 2017.

/s/ Chris W. McCarty
Chris W. McCarty, Esq. (BPR #025551)
LEWIS, THOMASON, KING, KRIEG & WALDROP, P.C.
One Centre Square, Fifth Floor
620 Market Street
P.O. Box 2425
Knoxville, TN 37901
(865) 546-4646
Attorneys for Plaintiffs

## COST BOND

      We acknowledge ourselves as surety for all costs, taxes, and damages in this case in accordance with Tenn. Code Ann. § 20-12-120.

                              LEWIS, THOMASON, KING, KRIEG & WALDROP, P.C.

                              /s/ Chris W. McCarty
                              Chris W. McCarty, Esq. (BPR #025551)